UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES TIMOTHY BENNETT,

                Petitioner,

     -vs-

THOMAS POOLE, Superintendent,

                Respondent.

_____

**DECISION AND ORDER**
**No. 04-CV-0014(VEB)**

## I.      Introduction

*Pro se* petitioner James Timothy Bennett ("Bennett" or "Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his April 12, 2000 conviction on charges of second degree murder and first degree robbery. The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.      Factual Background and Procedural History

### A.      Pre-trial Proceedings

Bennett's first contact with law enforcement occurred in the spring of 1997. Investigator Patrick J. Finnerty ("Inv. Finnerty") of the Erie County District Attorney's was investigating a series of financial crimes involving a missing person named Ralph Lindeman. Inv. Finnerty's investigation led him to Bennett, who appeared to have been involved in the fraudulent cashing of checks belonging to Lindeman. R.81-82.[1] Inv. Finnerty contacted Bennett by telephone, reaching him at his home in Medina in Orleans County. Bennett agreed to meet with Inv.

_____

[1]      Citations to "R.__" refer to the record on appeal in state court, attached as part of Respondent's Exhibits ("Resp't Ex.")  submitted in support of his answer to the petition.

Finnerty at a Napa Auto Parts store parking lot on Wehrle Drive outside of the City of Buffalo

on the afternoon of May 8, 1997. Inv. Finnerty waited in his vehicle; his colleague, Inv. Cleary,

also was present but in a different car. Bennett arrived on a motorcycle and voluntarily entered

Inv. Finnerty's vehicle, where Finnerty showed him various checks payable to Lindeman and

photographs of individuals cashing these checks. R.83-84. Inv. Finnerty testified at the

suppression hearing that he showed Bennett one particular photograph which he believed clearly

depicted Bennett. R.85. When asked if he recognized anyone in those photographs, Bennett

stated that one individual looked like him, but was not him. *See* Resp't Ex. F at A:208. Inv.

Finnerty said that he had additional photographs that he wished to show Bennett and asked if he

would be willing to continue their discussion at the nearby state police barracks in Clarence.

Bennett agreed.  R.86. Bennett did ask something to the effect of, "do you think I should call a

lawyer." R.120-21; *see also*. Resp't Ex. F at A:160. Inv. Finnerty said that he could not give him

legal advice." R.121. Inv. Finnerty said words to the effect of, "you could make the decision or

you could make a determination about getting a lawyer after you see all the stuff . . . ." R.121.

Bennett did not mention calling a lawyer again during his interview with the investigators.

R.121, 167.

Bennett was not under arrest and Inv. Finnerty was not intending to arrest Bennett based

on the information he had then. Inv. Finnerty was trying to determine how he would have had the

financial instruments of Lindeman, but he obviously had not spoken to Lindeman to know if this

was authorized or not. R.86.

Once at the barracks, both investigators continued to discuss the matter with Bennett and

were joined some time later by Inv. Cooley. During their conversation, Bennett admitted that he

had negotiated a number of Lindeman's checks, used his credit cards, sold several of Lindeman's

vehicles, all of which was done in conjunction with an individual named Jeremiah Cordero.

R.89. Inv. Finnerty began to type up a statement which Bennett reviewed, read aloud, made

corrections to, and signed. R.91-95. The written statement included a preamble notifying Bennett

of his rights under *Miranda*. However, Inv. Finnerty did not read Bennett the *Miranda* warnings

at any time during their discussions on the 8th of May 1997.

In the typewritten statement, Bennett indicated that in November 1996, he cashed various

checks and financial instruments payable to Ralph Lindeman with identification given to him by

Jerry Cordero. Cordero never told him how he had gotten Lindeman's identification. Bennett

said that he kept 20% of the proceeds and gave the remaining 80% to Cordero. According to

Bennett, he did not know what had happened to Lindeman.[2] At that point, Inv. Finnerty was not

intending to arrest Bennett. Bennett did not ask to leave at any point, and never asked to stop the

interview or anything of that nature. R.97-98.

Shortly thereafter, while Bennett was still at the state police barracks, a couple of other

investigators took Inv. Finnerty aside and informed him that they had performed a check of the

motorcycle driven by Bennett and discovered that it had been reported stolen. R.96. According

to the investigators, up until this point, Bennett had been free to leave the barracks had he chosen

to do so. R.97. However, once the information about the stolen motorcycle came to light, the

investigators informed Bennett that he was going to be criminally charged with regard to that.

---

[2]    It was not until more than a year later that the authorities discovered that Lindeman, in fact, was
dead. On December 20, 1998, more than a year later, an Orleans County man was hunting with his dog in a rural
area of Orleans County when they came across what appeared to be a human skull. *See* R.685-87. The man
contacted the police, who came out to the scene to investigate. Up until that point, although Lindeman had been
missing for some time, it was not known whether or not he was dead. Eventually, a forensics expert compared the
skull to the dental x-rays of the missing Lindeman and confirmed that the skull was his. R.746-55.

R.98. They did not charge Bennett with any crimes regarding the Lindeman matter at that time.
*Id.*

### 2.      The July 22, 1999 Statement

As the investigation progressed, the police focused their attention on Bennett and

Cordero, the individual whom Bennett had mentioned in his previous statement. On July 22,

1999, Bennett appeared at the Orleans County District Attorney's Office in Albion, New York,

along with his attorney, the Orleans County Public Defender. Also present were prosecutors

from the Orleans County and Erie Count district attorneys' offices, an investigator from the

Orleans County Sheriff's Department, and Inv. Finnerty. R.11. Before the interview started, Inv.

Finnerty advised Bennett of his rights under *Miranda*. R.103-04. At that time, Bennett was not

under arrest for the Lindeman matter.

At the July 22, 1999, conference, Bennett was questioned by both of the assistant district

attorneys, and his statement was recorded stenographically and transcribed. This statement

provided more inculpatory details regarding Bennett's involvement with Lindeman. Bennett

testified that on the night in question in November 1996, the plan was for him to drop Cordero

off near Lindeman's house and wait for Cordero to come back. R.18. Cordero "was planning on

going into the house and getting checks from Ralph Lindeman and possibly tying him up" to

"persuade [Lindeman] to sign the checks or give Jerry [Cordero] the checks."  R.18-19. Before

this occurrence, Bennet had already cashed a check written by Lindeman for approximately

$9,000. R.19. Bennett testified that he did not know why Lindeman had given checks to them

earlier, but in November, Cordero decided to tie Lindeman up in order to get him to sign the

checks. R.20. About an hour and a half later, Cordero returned driving Lindeman's car, a Ford

Crown Victoria LTD sedan. They drove back to their apartment building on Delaware and parked Lindeman's car. Bennett did not remember what they did once back at the apartment.

At a later time, Cordero told Bennett "that Ralph Lindeman had died, he said that when he had tied him up he had strangled him and Ralph had died from that." R.22. Bennett was "pretty sure" that the strangling had occurred on the night in November. *Id.* At Cordero's request, Bennett accompanied him to Lindeman's house and helped remove Lindeman's corpse, which was wrapped in a blanket. R.22-a. Bennett stated that neither he nor Lindeman removed any financial items, credit cards, checks from the house. R.23.

He and Cordero talked about taking the body to a "place that was quiet, isolated[,] where we could dispose of [it] and he said . . . he had a gas can in the car, he said he was going to torch it." R.24. They just drove around Orleans County until they found a spot they both agreed was appropriate, and they removed the body from the car and carried it about 100 yards from the road. R.24. Bennett stated that he could and would assist the investigators in locating the body. R.24-25. Cordero doused the corpse with gasoline and sit it on fire, and they both drove away as the body was still burning. R.25. He and Cordero drove back out to the site about three to six weeks later, and Cordero used a folding knife to sever Lindeman's head from his body. R.35. Cordero said that he "wanted to make it harder for them to identify the body." R.36. Cordero and he transported the head to Mix Road where Cordero lit the head on fire and tossed it about ten to twenty feet off the road. R.36.

They returned to Buffalo that night. Some time later, they went to Lindeman's house and "got like a stereo and some cash that was lying around . . . [but] didn't get any financial instruments there or any identification." R.26. Bennett did not know if Cordero picked up any

financial instruments at that time. R.26-27.

Bennett eventually sold Lindeman's Crown Victoria to a car dealership in Hamburg for about $10,000. Bennett cashed the checks on two separate days and gave the money to Cordero who gave him back "upwards of about one-thousand dollars." R.27.

Bennett admitted that some time after that, he conducted a series of about eight financial transactions impersonating Lindeman–he cashed checks, made credit card purchases, and cashed certificates of deposit. R.27-28. He diverted a total of about $35,000 by impersonating Lindeman. R.28.

At some point in time, Bennett became aware that Lindeman also had a country home in Akron, New York. R.28. Bennett believed that he had been there but did not remember loading a quantity of Lindeman's property from that residence into Lindeman's white Ford pick-up truck. R.28. However, he did remember unloading the truck and recalled selling several items from the truck, such as a battery charger. R.29. Bennett's father was present during some of the sales of these items. R.30. Bennett stated that he drove the pick-up down to Long Island where he sold it. R.30.

Bennett stated that he had "a very good suspicion that Jerry [Cordero] had obtained a loan from Mr. Lindeman and was not paying it back and he was, I don't know, used this opportunity to get him out of the picture so-to-speak." R.37. The questioning of Bennett terminated at this point.

Bennett was not under arrest at the conclusion of this statement. R.103-11. Afterwards, Inv. Finnerty and Inv. Larkin drove Bennett to the locations where Bennett had stated the parts of Lindeman's body were thrown. R.112-13. They returned to the district attorney's office where

further discussion occurred between the lawyers. Charges were filed against Bennett later that day. R.114.

### 3.    The Grand Jury Proceeding

On September 30, 1999, Bennett, accompanied by his attorney, appeared before an Orleans County grand jury. Bennett executed a waiver of his right to immunity from testifying before the grand jury and a waiver of his right to remain silent. Bennett acknowledged that he was under no obligation to testify, and that in exchange for his testimony and cooperation in the prosecution of Cordero, he would be permitted to "enter a plea to a [class] B violent felony . . . , and that in addition thereto, [he] would be pleading to . . . burglary second, grand larceny third and a [sic] forgery in the second degree . . . ," R.820-21.

In his sworn grand jury testimony, which was later read into the record at petitioner's trial, R.819-882, Bennett told yet another story. Bennett repeated his admissions that he had forged checks and other financial instruments belonging to Lindeman, and that he stolen and sold numerous items of Lindeman's property. However, Bennett told the grand jury, for the first time, that he had been present at the time of Lindeman's death. According to Bennett's grand jury testimony, instead of simply waiting for Cordero in the car, he joined Cordero in Lindeman's apartment. He understood beforehand that he was to be there when Cordero confronted Lindeman, and that Cordero "was going to tell [Lindeman], he was going to tell him that he wanted cash from him." R.837. Bennett acknowledged, "I knew it wasn't legal, that it wasn't a legal method we were going to use to get the money." R.839.

Bennett testified that when he entered the apartment, "Jerry had begun raising his voice to Mr. Lindeman [saying] he wanted him to give him some money, to give him, he wanted him

to give him some checks." R.841. Then Cordero attacked Lindeman, striking him with his fists.

Bennett testified that he attempted to get Cordero to stop, but he was unsuccessful. R.842.

Eventually, Bennett realized that Cordero had killed Lindeman. R.843. Cordero threatened

Bennett and warned him not to say anything about what had happened. R.847-48.About three

days later, Bennett and Cordero returned to Lindeman's apartment and removed the body. They

drove the corpse to Orleans County where they disposed of it in the manner described by Bennett

in his earlier statements. R.848-54.[3]

The grand jury returned an indictment later that day charging both Bennett and Cordero

with three counts of murder (one count of intentional murder and two felony murder counts),

first degree burglary, and first degree robbery. *See* R.5-8.

### 4.      Petitioner's Subornation of Perjury in the Grand Jury

Subsequently, the District Attorney revoked his previous offer to allow petitioner to

plead guilty to a class B violent felony (first degree manslaughter) in satisfaction of the charges

against him. R.61, 260. The District Attorney stated that it had been discovered that Bennett had

procured perjury from two individuals–his fiancée, Amy Wasnock, and a friend of hers, Karen

Beu–to corroborate Bennett's testimony that Cordero was involved in the murder. R.67, 260.[4]

Bennett then moved to dismiss the indictment based on the prosecution's revocation of the

cooperation agreement. R.61. The trial court consequently ordered an evidentiary hearing on the

---

[3]      Bennett later moved to suppress the May 1997 and July 1999 statements, but this application was denied on December 20, 1999, as discussed further below in the context of Bennett's habeas claim.

[4]      As respondent points out, although it is not immediately evident from the record, the testimony of Beu and Wasnock was necessary for any prosecution of Cordero. This is because the testimony of petitioner, who was an accomplice as a matter of law, could not be the sole basis for convicting Cordero, in the absence of corroborating testimony. *See* N.Y. CRIM. PROC. LAW § 60.22.

issue of Beu's and Wasnock's perjury. R.175, 260-61.

The hearing was held on December 28, 1999. *See* R.177-259. Beu said that Wasnock had approached her and given her a letter that she wanted Beu to memorize and tell to the authorities and at any court hearings. R.183-87. The letter described an incident one night in which Beu supposedly had overheard an argument between Cordero and Bennett over a check, during which Cordero admitted killing Lindeman. Beu said that the contents of the letter were untrue. Beu testified that she subsequently had met with Bennett at the Orleans County Jail; Wasnock was present, too. Bennett asked "if I would tell this story before any future hearings or investigation, that sort of thing." R.189. Bennett acknowledged that he had written the letter to Wasnock. R.189. Beu told Bennett that she would do it, but in her mind she still was not sure. R.190-91. Beu later told the false story to Inv. Larkin and before the grand jury. R.194, 196. Beu indicated that she had been charged with a felony as the result of her perjury, and had agreed to plead guilty to a misdemeanor charge. R.203-04.

Rodney Banks ("Banks"), an inmate with Bennett at the Orleans County Jail, testified for the prosecution at the hearing. According to Banks, Bennett said that "he needed to be backed up, things had to be said to back up what was said at the grand jury." R.222. Bennett told Banks that he needed "two girls that would come in and testify for him to back up what was testified [sic] at the grand jury." R.224. Bennett then gave Banks two letters and "to give them to the two girls, Nikky and Jennifer,[5] so they could read them and practice them so they would know what to say when it came time to testify." R.227.  Bennett offered Banks $4,000 for transmitting these letters to "Nikky" and "Jennifer." Instead, Banks gave the letters to his wife to give to his

---

[5]      "Nikky" and "Jennifer" were fictitious individuals created by Banks and said to be friends of his from Buffalo. R.234.

attorney. R.236.

At the conclusion of the hearing, the trial court ruled that the prosecution had

demonstrated, beyond a reasonable doubt, that Bennett had procured perjury on the part of Beu

and Banks. R.255, 256. Beu and Banks "did clearly commit perjury" and "perjured themselves to

support his [Bennett's] testimony." R.255. According to the trial court, Bennett

> thereby significantly undermined the People's case as it relate[d] to both him and
> to the former defendant, Cordero. By undermining the prosecution, he negated the
> plea offer that was made to him as set forth in the papers and he caused the plea
> bargain to become unraveled by his own criminal conduct.

R.255 (citing *People v. Curdgel*, 83 N.Y.2d 862 (N.Y. 1994)). The trial court concluded that the

prosecution was permitted to use petitioner's grand jury testimony at trial. R.257-58; *see also*

R.260-61.

**B.     The Trial**

Bennett's five-day trial was conducted on January 12-14, 2000; January 18, 2000; and

January 20, 2000 in Orleans County Court (Punch, J.).  A summary of the relevant trial

testimony follows.

**1.     The Victim's Disappearance**

Ruth Morrish, Lindeman's half-sister, testified first for the prosecution. The last contact

Mrs. Morrish had with her brother was in early November 1996. Lindeman had called her and

said that he was "afraid" and had pinned his drapes shut. Prior to this time, she typically spoke

with him one to three times a week. When she returned home on or about December 1, 1996,

after being away for Thanksgiving, she received a phone call from Dave Klimchuk, a neighbor

of her brother's. As a result of this phone call, Mrs. Morrish and her husband, William Morrish,

went over to Lindeman's house on West Avenue to check on him. R.363-65; R.373-79.

When Mr. and Mrs. Morrish arrived at the house, it was locked and the keys that they had been given by Lindeman did not work. The drapes were pinned shut so they could not see inside the house. Neither of Lindeman's vehicles was there.

When Mr. and Mrs. Morrish were still unable to get in the next day, they called the police and informed them that they were going to try and break in. With the police present, Mr. Morrish pushed the door down and officers then searched the house. Lindeman was not there, but all of his belongings seemed to be in order. However, there were no sheets or blankets on the bed. R.379-82.

They closed the house back up and left a note asking Lindeman to contact them when he got home. Mr. and Mrs. Morrish were told by the police to "give it another week." The two left and went to Lindeman's other property located in Akron, New York, where there was no sign of Lindeman. The Morrish's left another note for him and departed.  R.383-86.

The next day, Mr. Morrish returned to the house on West Avenue and changed the lock. The premises were in the same condition as before. At the end of the week, however, when Mr. Morrish went back to his brother-in-law's house, it was obvious that someone else had been there: Lindeman's microwave was gone, along with a pewter cup, various pieces of silver, and a stereo. R.387-89.

Now the Morrishs were very worried. Mr. Morrish changed the locks at West Avenue again. The next day, he and Mrs. Morrish went to the police station to file a missing persons report. Mr. Morrish began to check Lindeman's mail frequently, and noticed that some checks had been cashed and money was being spent. Mr. Morrish attempted to figure out where the checks were being cashed, but was unsuccessful. R.390-93.

On January 5, 1997, Mr. Morrish was notified by the Orleans County Sheriff's Department that some of Lindeman's property had been found. About five days later, Mr. Morrish went to the sheriff's office where he was shown the items–handguns, rifles, bows and arrows, and some personal papers–sitting on a pile of brush; some of the items were in a garbage bag. R.394-405.

A year later, on January 9, 1998, Mr. Morrish went back to Lindeman's house on West Avenue and discovered his brother-in-law's wallet.

Klimchuk had been Lindeman's neighbor since about 1994. Lindeman let him park his vehicles in front of Lindeman's garage. On about the 10th of January, 1997, Klimchuk went into Lindeman's garage and noticed that many items were gone, including a pick-up truck, several tools, a battery charger, and a lawn mower. Klimchuk stated that all of these items had been there prior to that date. R.429-34.

Albert Cretucci was a friend of Lindeman's. During their conversations in late October, early November of 1996, Lindeman was very concerned for his safety. Apparently, Lindeman had written a letter to a person named Willie Cordero, his next-door neighbor. R.506. The letter concerned  the fact that Lindeman had lent money to one of Cordero's sons. R.504-07. Lindeman said that he had had a sexual relationship with the son that "Willie would have been really mad about . . . ." R.507. Lindeman said that one night, he had gotten "really drunk" and "wrote a letter to Willie saying that he had been with his son and that he lent [the] son money and it wasn't being paid back . . . ." R.508. The next day, Lindeman was "definitely scared over what might happen as a result of him putting the letter in the mailbox." R.508. Cretucci's last contact with Lindeman was in mid-November. When he went to Lindeman's house at around

that time, Lindeman's curtains were pinned shut with clothespins. R.508. With regard to

Lindeman's lifestyle, Cretucci described him as a "drinker" who "partied with different drugs,"

such as cocaine, but he "didn't have people coming over or anything like that." R.509.

### 2.     The Investigation Targeting Petitioner

In 1997, Investigator Patrick Finnerty of the Erie County District Attorney's Office

became involved in investigating who was cashing checks made out to Lindeman and making

purchases with Lindeman's credit cards. Investigator Finnerty was able to obtain some

photographs from check-cashing services and attempted to identify the negotiator of the checks.

R.552-54. His investigations led him to contact Bennett on May 8, 1997, to ask if he could show

him the photographs of individuals negotiating Lindeman's checks in order to find out if there

was an explanation behind it. Bennett agreed to meet with him.

Later that day, Bennett arrived by motorcycle at their designated meeting spot. Since it

was a cold day, Investigator Finnerty recalled, he asked Bennett to sit in the patrol car while he

showed him the photographs. When asked if he recognized anyone, Bennett replied that he was

"not sure." He then agreed to go with Investigator Finnerty to the state troopers barracks to

continue discussing the matter. R.555-57.

During their interview, Bennett admitted that he had in fact negotiated these financial

instruments payable to Lindeman and that it was he (Bennett) in the photographs. R.561. When

asked how he came to be in possession of Lindeman's checks, Bennett said that he was owed

money by Lindeman. With regard to one particular check, petitioner said that it was due to him

and that the check was given to him in Lindeman's name. R.562. When confronted with

nonsensical nature of that explanation, petitioner eventually admitted that he had negotiated

these checks, kept some of the proceeds for himself, and shared some with another individual.

He also admitted taking Lindeman's truck, and driving it to Long Island where he sold it. R.561-64.

Investigator Finnerty asked petitioner if he had ever discussed the possible demise of Lindeman with anyone. Bennett replied that "he had told a [person named] John that he had cut a man's head off or was involved in burning it and disposing of it," R.564-65. At this point, Investigator Finnerty began to memorialize the statement using a typewriter that was present in the room. Bennett reviewed and signed the statement, R.565-66, which was read into the record at trial. R.571-76.  In pertinent part, the statement read as follows:

> I, James Bennett, being first duly sworn according to the law, deposes [sic] and says [sic] I have been advised   . . . that under provisions of the Constitution, I cannot be compelled to be a witness against myself and knowing that anything I may say may be used against me, I wish to make the following statement . . . without coercion or threat, without promise of immunity. This statement is a voluntary act on my part . . . . I have been advised of my right to consult an attorney and to consult with any other individual. I understand that I have the right to have an attorney present and if unable to afford an attorney, one will be appointed to [sic] me prior to any questioning.
>
> I have been shown a copy of a photo taken at the time of negotiation of a check shown in that photo . . . . payable to Ralph Lindeman in the amount of two thousand five hundred [dollars] and one cent.[6] I cashed that check with the ID given to me by Jerry Cordero. Cordero never told me how he got the identification of Lindeman . . . . I kept twenty percent of the check, gave the remainder to Jerry Cordero. I also cashed in two certificates of deposit for nine thousand dollars each in the name of Ralph Lindeman. I would keep twenty percent and Cordero would keep eight percent. I bought a stereo set and a computer system at Sears in November. . . . I also took Ralph Lindeman [sic] car and sold it back to Adkins Ford, took the two checks from the sale and again kept

---

[6]      Ralph Endres, a bank-protection specialist working for Rochester Community Savings Bank, began investigating a series of financial instruments that were cashed in the name of Ralph Lindeman in November 1996. Endres identified a photograph dated November 19, 1997, of an individual cashing a check made payable to the victim. R.599-602. Endres also testified that a withdrawal in the amount of $10,054.75 was made from Lindeman's account, and a cashier's check in the amount of $5,000, payable to Lindeman, was cashed. R.602-11.

20%, giving the remainder to Cordero. I drove a white truck that belonged to Lindeman to Long Island and sold [sic] got cash for the sale and again split [sic] with Cordero. About the same time, articles, guns and papers belonging to Lindeman taken from his Akron residence were given to me by Cordero and I threw them away in a dump site at a cemetary [sic] near my pareent [sic] home in Shelby NY. I cashed checks on credit card of Lindeman and split those proceeds with Cordero. Totally[,] I personally received $15,000-20,000 for my share of all check and car sales Cordero claimed he recieved [sic] the same amount and he claims he at one time left $20,000 in cash at address of sister of Ralph Lindeman[.] I don't [sic] know if this happened or reasoning behind it but this was told to me by Jerry Cordero. I do not know what happened to Ralph Lindeman and I know I did not murder him or dispose of him in any way[.] Even though I spoke to Jon Lee about disposing of a body I was talking wild to impress him. I threw the Lindeman Id [sic] away in a dumpster and I never met Lindeman or was I at his house in Akron. I did enter Lindeman's house on West Ave in Buffalo after Cordero gave me the key.

I realize what I did was wrong and unauthorized by Lindeman . . . . I needed the money to support myself. Lindeman did in August 1996 give a check to Cordero which he signed his name on[.] I wrote James Bennett on it as payee and I cashed it[.] I got $500 for that check. I signed Lindeman's name on all other check [sic] as the maker and I endorsed them in order to cash them using Lindeman's Id [sic] given to be by Jerry Cordero.

This statement is true and correct to [the] best of my current recollection.

R.41-42 (copy of signed statement); *see also* R.573-76 (testimony of Inv. Finnerty reading statement into record).

On cross-examination, Inv. Finnerty denied that Bennett was in custody while he was being shown the checks in the patrol car, or during the interview at the police barracks. R.585-86. According to Inv. Finnerty, Bennet was "free to leave" at any time.  R.585, 587. Bennett did not ask to leave, however, at any point. R.587.

### 3.    Petitioner's Statements to Acquaintances Regarding the Incident

Jonathan Lee was the "Jon Lee" referred to in Bennett's May 8, 1997 statement given to Inv. Finnerty. Lee was living at 363 Delaware Avenue in November of 1996, having moved in

the previous April. A few days after Lee moved in, Jeremiah Cordero moved into the apartment

directly above him. A week later, Bennett moved into an apartment on the third floor. Lee had

known Cordero from a few years earlier when they had worked at the same collections agency.

He also got to know Bennett and they became the "three amigos" and used to hang out with each

other. R.512-13.

During the fall of 1996, Lee noticed that both Cordero and Bennett began having large

amounts of money on them. Prior to that time, Lee had never seen them with that much cash.

Also, Bennett acquired some new items around that time–a television, a computer, a nice chess

stand video games. R.514-18.

In February of 1997, Lee went over to Bennett's apartment to play videogames on his

new computer. Bennett seemed "agitated and kind of aggravated" so Lee asked him what was

wrong. Bennett put him off at first, and "made some obscure hand gestures"; Lee said that he did

not understand and said, "come right out and tell me what's going on." R.521. Bennett "started

to tell [him] this story" that "he had been involved with somebody who wasn't a very nice person

and one thing had lead [sic] to another that this person was no longer with [them]." R.521. Lee

testified that Bennett "actually admitted . . . that he had killed someone." R.521-22. Bennett did

not give the details of the murder but said that "the individual was not a nice person"; Bennett

described the victim, whom he identified as Lindeman, with "phrases like child molester and . . .

faggot." R.522. Bennett described to Lee how he had "covered the body with ten gallons of

gasoline and burned it and that he took the head," but Lee did not know what Bennett did with

that. R. 522-23. Bennett told Lee that he had buried the body out in the woods. R.522-26.

Bennett also told Lee that he had gotten his new computer by using a credit card that did not

belong to him. Lee thought Bennett was "full of crap" at the time.

About a day or two later, Bennett asked Lee if he knew how to sell property that was in someone else's name, mentioning that he had property deeds and other bank papers belonging to somebody else. R.525. Bennett mentioned these items had come from the person he had killed, Lindeman. R.526.

The prosecution also called Kristen Oliveri, one of Cordero's ex-girlfriends. She was dating Cordero from March 1997 to November 1997, and knew Bennett. R.779-81. In March of 1997, she and Cordero drove to Bennett's house in Medina, and picked up Bennett and drove back to Buffalo. During the car ride, Oliveri recalled, there was a conversation between Cordero and Bennett, in which Bennett said that investigators were calling both his house and his parents' house. Cordero responded by saying that investigators were coming around the apartment on West Avenue every day as well. Oliveri stated that their conversation "got somewhat heated up and Tim had said that he wouldn't betray Jerry and that he loved him . . . ." Cordero "said shut the fuck up twice" in response and then "told him to get out of the car." R.782. Oliveri had no further contact with Bennett after that day.

### 4.    The Selling of Lindeman's Property by Petitioner

Joseph Ferreri maintained a used car dealership on Long Island, in the town of Ronkonkoma. In January of 1997, Ferreri bought a white 1990 Ford Ranger pick-up truck from an individual whom he believed to be Ralph Lindeman. R.589-92.

Mark Adkins, of Jack Adkins Ford dealership, was involved in a transaction with an individual purporting to be Ralph Lindeman who wanted to sell a black1996 Ford Crown

Victoria LTD.[7] Adkins and this individual agreed on a price and planned to consummate the sale the following day. R.612-15. Adkins recalled that the seller had requested the funds to be in two separate checks–one in the amount of $5,000, and the other in the amount of $9,000. R.602-11.

Foster Bennett, petitioner's father, testified that he went to an auction in Middleport sometime after January 1997. Petitioner had some tools he wanted to sell, including an air compressor and some small hand tools. After reviewing the receipts, Mr. Bennett testified that the tools included a paint sprayer, a grinder, an air drill, an air chisel, a drill hammer, a battery charger, a 35,000-btu heater, a lawn mower, a wheel balancer, a sand-blaster, and a drill press. R.633.35. Petitioner told his father that he had acquired the tools from a garage in Buffalo.

Kip Garris, who ran the auction in Middleport, testified to having dealt with petitioner in early 1997, when petitioner brought him some tools to have sold at the auction. Garris indicated that petitioner ended up buying back some of the items later.

### 5.    The Discovery of the Victim's Remains

Jeffrey Atwell, an Orleans County resident, was out with his dog hunting rabbits on Mix Road on December 20, 1998, when they came across what appeared to be a human skull in a wooded area about twenty to thirty feet off the road. After discovering the skull, Atwell left it alone and contacted the police. R.685-87.

Investigator Harmer, of the Orleans County Sheriff's Department, responded to the call regarding the skull on Mix Road. Investigator Harmer secured the scene and contacted the

---

[7]    Mary Ellen Wasnock rented a room to petitioner's cousin. In December of 1996, Mrs. Wasnock went to a friend's house for a social visit, accompanied by her son, petitioner, and petitioner's cousin. Petitioner was driving a large-sized, dark-colored vehicle, the make and model of which she was not sure. Petitioner told Mrs. Wasnock that the car belonged to a friend and he was just borrowing it. Mrs. Wasnock had seen petitioner with that vehicle on only one other occasion, about two weeks previously. R.630-32.

medical examiner, Scott Schmidt, the Orleans County Coroner. Jon Cody, of the Monroe County

Medical Examiner's Office, also was summoned. They secured the skull in an evidence bag. Soil

samples were taken from the area around the skull. R.697-99; 700-03.  Cody stated that they

found a mandible and two vertebrae in the area; these bones appeared to human. R.711-13.

Robert Chick, a general dentist, testified that Lindeman was a patient of his. On April 5,

1987, Dr. Chick prepared some x-rays in connection with Lindeman's dental work. Lindeman

had last visited Dr. Chick in February of 1988. R.746-55.

Frederick Halik, a forensic dentist with the Monroe County Medical Examiner's Office,

testified that he specialized in dental identifications and bite-mark analyses. Dr. Halik testified

that he examined the skull found on Mix Road and determined that it was human in origin.

Further, based upon the remains and the x-rays, Dr. Halik that they were identical and that the

skull was that of Ralph Lindeman. R.795-98, 808.

### 6.      Petitioner's July 22, 1999 Statement to the Authorities

Investigator William Larkin, of the Orleans County Sheriff's Department, testified that he

met Bennett and his attorney at the Orleans County Public Safety Building on July 22, 1999.

R.729. Bennett "had apparently contacted his attorney, his attorney contacted [the assistant

district attorney] and wanted, Mr. Bennett wanted to come in and give us some information

regarding the Mr. Lindeman case." R.729.  Bennett was read the *Miranda* warnings and was

asked questions by an assistant district attorney from Orleans County and from Erie County, Inv.

Finnerty and Inv. Larkin. R.736. After about forty minutes, they decided that a transcript should

be taken and, with Bennett's consent, a stenographer came in and took a statement from him.

R.731, 737. Bennett's attorney was present the entire time, and he had the opportunity to consult

with him when he asked to do so. R.732.

On cross-examination, Inv. Larkin stated that he had gone to Bennett's parents' home and left his business card on March 3, 1999, and asked them to pass it along to Bennett. Inv. Larkin stated that he had not had direct contact with Bennett prior to July 1999. R.733, 736.

The transcript of the July 22, 1999 interview, partially redacted to eliminate hearsay issues and some personal data, was introduced at trial. *See* R.743. The substance of the July 22, 1999 statement has been set forth in more detail, *supra*.

### 7.     Petitioner's Testimony Before the Grand Jury

The transcript of Bennett's testimony before the grand jury, also partially redacted, was offered into evidence, R.743, and read into the record by the assistant district attorney, R.818-85. The substance of Bennett's grand jury testimony has been set forth in this Decision and Order, *supra*.

### 8.     The Evidence of Petitioner's Attempts to Suborn Perjury in the Grand Jury

Amy Wasnock, Bennett's fiancée, testified regarding a conversation she had with him at the beginning of August 1999. Wasnock asked if there was anything she could do to help. R.893-96. Shortly thereafter, she received a letter from Bennett, which she destroyed because she wanted no one else to see it. R.902. The letter described what Bennett's apartment looked like, and suggested that her version should be that she had been "there one night that we decided, Karen Beu, myself [Wasnock] and [petitioner], that we were going to go out and that when we came back, Jerry [Cordero] had opened the second floor apartment door and said that he was gonna come up, and that he [Cordero] had admitted, they got into a little fight and admitted that he had killed Ralph Lindeman." R.903. Wasnock was not in Bennett's apartment to hear Cordero

-20-

say that, and she had never heard that story before. R.905. Wasnock later met with her friend

Karen Beu "to ask her if she would help, if she would read the story and do the same thing that I

was doing." R.906.

Karen Beu testified that she visited Bennett at the jail with Wasnock in August of 1999.

Bennett asked her if she "would help him out . . . with the case that he was involved in." R.935.

Beu "was not sure at the time" and said that she "would let him know at a later date." What he

wanted her to do was "tell the story that he had written stating that [she] had overheard Mr.

Bennett [petitioner] and a James [sic] Cordero talking about a check that Mr. Cordero wanted

him to cash and that Mr. Bennett had refused to do so." R.935. She was supposed to say that

Cordero threatened Bennett saying, "he would kill him like he did Mr. Lindeman" if Bennett did

not cash the check. R.936. Beu did not know Cordero and had no knowledge of any check-

cashing or of Cordero's alleged statement about killing Bennett. R.935, 936. Eventually, Beu

agreed to help out Bennett, even though she knew that the story he wanted her to tell was not

true. R.936-37.

Beu admitted she had been charged with felony perjury and that, as a result of her

cooperation, the charge was being reduced to a misdemeanor. R.937-38.

Banks, the he inmate with Bennett at the Orleans County Jail, was housed there during

the months of July, August, September, and October of 1999. He and Bennett were on the same

cellblock together. R.907. One day, in July or August of 1999, Banks and Bennett were

"wrestling around" and Bennett told Banks that he "was pretty strong, strong like Lindeman."

R.909. Banks asked him what he meant by that and Bennett replied that "he was wrestling and

holding Lindeman down while Jerry choked him." R.909.

Some time later, Bennett asked Banks, "did [he] know any girls in Buffalo that would testify for him in his grand jury hearing." R.910. Banks asked him "what did they have to say." Bennett said that "each one of them had to say they went out with [Cordero], had sexual contact with him, things like that." Bennett said "they had to verify what he said in the grand jury." R.910. Bennett told Banks that he would pay him $4,000 "to get the girls to testify for him." Banks gave Bennett "one real name, one fake name." Nicole Briggs actually was a friend of his, but Jennifer Elston did not exist. R.911.

Before Bennett was scheduled to appear before the grand jury, he gave Banks two envelopes to give to Nicole and Jennifer. Bennett told Banks that the girls "had to memorize these letters so when they went to the grand jury, that they knew exactly what to say." R.913. Banks then gave the letters to his wife, who gave them to his attorney, who turned them over to the prosecutor. R.913. Bennett did not ever pay him the $4,000. R.918.

In October of 1999, Banks recalled that he was watching the news with Bennett at the jail, and story came on regarding the arrest of Cordero. Upon seeing this, Bennett said "that makes him look better now, that helps him out cause Jerry had got arrested for the murder." R.919. Bennett was "happy and smiling" and "ran and got on the phone." R.919.

Banks testified that he spoke to his attorney about Bennett "[t]o see could [he] get a better deal." At that time, Banks had pled guilty to fifth degree criminal possession of a controlled substance, and had received a sentence of two to four years. R.920. Banks did not receive a better sentence as a result of cooperating with the prosecution. R.921. However, Banks did receive recommendations from the district attorney and the sentencing judge that he be placed in a ninety-day drug treatment program from which he would be released directly to

parole, assuming he completed the program successfully. R.921-22.

### 9. The Defense Case

At the close of the prosecution's proof, defense counsel made a motion for a trial order of dismissal. The trial judge agreed with defense counsel that the prosecution had failed to make out a *prima facie* case of burglary, finding that there were "substantial gaps in the proof with regard to the entry into the home" as it was "not at all clear that they, that Cordero went in there without some kind of license to do so." R.944. Accordingly, the trial judge dismissed the first and second counts charging first degree burglary and the felony murder premised on first degree burglary. *See* R.941-45. The trial judge found that there was a *prima facie* case of second degree (intentional) murder based "primarily on the testimony of Jonathan Lee," R.944, and robbery in the first degree.

Trial counsel then presented the defense case, the theory of which was that Cordero was the criminal mastermind, the individual who orchestrated the extortion, defrauding, and killing of Lindeman. Defense counsel argued that Bennett, "out of fear, out of duress and out the intimidation of Cordero," "follow[ed] Cordero's path"into being involved in the Lindeman affair. R.991 *et seq.* To that end, defense counsel introduced the grand jury testimony of Diane Chiaravalle, who was Cordero's girlfriend and, at Cordero's request, in cashed checks belonging to Lindeman. R.949-71. As defense counsel later argued during summation, Chiaravalle said she "operated on a need to know basis, that she had some fear of Cordero, that he was abusive" and "that she just did what she was told to do . . . to keep things smooth between them." R.991. When Kristen Oliveri testified earlier, trial counsel made her a defense witnesses, and elicited testimony from her about Cordero's abuse of her and the fact that she left the relationship

because of his abusiveness and that she dropped out of college because Cordero did not think it was necessary for her to attend school.

Defense counsel requested and received a jury instruction on the affirmative defense to felony murder.[8] R.977-80.

### 10.    The Jury Verdict and Sentencing

Three counts were submitted to the jury–second degree (intentional murder), first degree robbery, and felony murder based on the underlying robbery.

The jury returned a verdict acquitting Bennett of intentional murder, and convicting him of first degree robbery and felony murder. Bennett was sentenced on April 12, 2000, to the maximum term of incarceration possible, twenty-five (25) years to life in prison. A concurrent sentence of 12 ½ to 25 years for the robbery conviction was imposed.

### C.    Post-Conviction Proceedings

Bennett's trial attorney also represented him on direct appeal. He raised the following four arguments in his appellate brief: (1) the trial court erred in failing to grant a mistrial based

---

[8]    In "any prosecution" for felony murder under P.L. §125.25(3), "in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury . . . .

N.Y. PENAL LAW § 125.25(3).

on the prosecutor's comment that petitioner "had agreed to plead guilty to a killing"; (2) the trial court erred in failing to suppress petitioner's May 8, 1997 statement because it was the product of a custodial interrogation in the absence of *Miranda* warnings; (3) the trial court erred in permitting the testimony of Wasnock, Beu, and Banks as it pertained to petitioner's solicitation of testimony incriminating Cordero;[9] and (4) the trial court erred in admitting petitioner's grand jury testimony which had been induced by a plea offer which subsequently was reneged upon by the prosecution, and therefore was in violation of Penal Law § 60.45.

The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the conviction in a decision and order entered October 1, 2002. *People v. Bennett*, 298 A.D.2d 964, 748 N.Y.S.2d 116 (App. Div. 4th Dept. 2002). The New York Court of Appeals denied leave to appeal on December 31, 2002. *People v. Bennett*, 99 N.Y.2d 555, 784 N.E.2d 80, 754 N.Y.S.2d 207 (N.Y. 2002).

On May 26, 2004, Bennett filed a *pro se* application for a writ of error *coram nobis*, alleging that his attorney had performed deficiently both at the trial and the appellate levels. *See* Resp't Ex. F. The Appellate Division summarily denied relief on July 9, 2004. *See* Resp't Ex. I.

### D.    The Instant Habeas Proceeding

Bennett filed his original habeas petition on or about January 9, 2004. Thereafter, Bennett moved to have his petition stayed so that he could return to state court to exhaust his state court remedies regarding certain new habeas claims in a *coram nobis* application before the Appellate Division. Bennett was subsequently permitted to file an amended petition incorporating the claims he had raised, albeit unsuccessfully, in his *coram nobis* application. *See* Docket No. 12.

---

[9]    Counsel indicates in his appellate brief that after the allegations involving perjury came to light, "[t]he charges against co-defendant, Cordero, were then dismissed . . . ." Resp't Ex. F at A:19.

Bennett's amended petition incorporates by reference the four arguments raised by appellate

counsel in his brief on direct appeal (Grounds I through IV). Ground V of the amended petition,

entitled "Ineffective Assistance of Appellants [sic] Counsel," incorporates the arguments made

in his *coram nobis* application.

Respondent answered the petition, interposing the defense of non-exhaustion with regard

to several of Bennett's claims. Respondent also argues that all of Bennett's claims are without

merit. Because it is more expeditious to dispose of Bennett's amended petition on the merits than

to resolve the exhaustion questions, the Court shall, in the interest of judicial economy, proceed

directly to a consideration of Bennett's claims. For the reasons that follow, I find that, as

respondent has argued, none of the claims in the amended petition warrant habeas relief.

## III.   Discussion

### A.   Prosecutorial Misconduct (Petitioner's Appellate Brief, Point I)

Bennett contends that the trial court erroneously denied his motion for a mistrial based

upon the following comment by the prosecutor during summation: "That's because he was

personally involved in killing Ralph Lindeman. He freely admitted to it on at least two

occasions. He was willing to plead guilty to it and that's in the record." R.1017. The trial court

immediately sustained defense counsel's objection and told the jury to "disregard that last

statement." R.1018. In addition, the trial court gave a further curative instruction at the request of

defense counsel; the instruction was written by defense counsel himself:

> Now, before we go any further, I'll instruct you as follows, the jury should not
> consider any plea agreement as set forth in the grand jury as evidence of the
> Defendant's intent to plead guilty to murder. Many cases are resolved by plea
> agreements, however, in this case, the plea agreement did not go through. The
> case should be decided on the facts and not on any proposed plea agreement. At
> no time, in any event, did the Defendant ever agree to plead guilty to the crime of

murder.

R.1030.  On direct appeal, the Appellate Division rejected Bennett's contention that the

prosecutor's "isolated remark" warranted a mistrial; the comment was "not so egregious as to

deprive [him] of a fair trial." *People v. Bennett*, 298 A.D.2d at 965 (citations omitted). Moreover,

the Appellate Division found, "the curative instruction, which was proposed by defense counsel

and which the jury is presumed to have followed, negated any prejudice to the defendant." *Id.*

(citations omitted).

To obtain relief based on a claim of prosecutorial misconduct, the habeas petitioner must

demonstrate that the "prosecutor [engaged in] . . . egregious misconduct . . . amount[ing] to a

denial of constitutional due process." *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990); *see*

*also Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). "'Inappropriate prosecutorial

comments, standing alone, would not justify a reviewing court to reverse a criminal conviction

obtained in an otherwise fair proceeding.'" *United States v. Elias*, 285 F.2d 183, 190 (2d Cir.

2002) (quoting *United States v. Young*, 470 U.S. 1, 11-12 (1985) and citing *United States v.*

*Modica*, 663 F.2d 1173, 1184 (2d Cir.1981) ("Reversal is an ill-suited remedy for prosecutorial

misconduct. . . .")). Rather, in order to warrant reversal, the prosecutor's misconduct must have

caused the defendant "substantial prejudice" by  "'so infecting the trial with unfairness as to

make the resulting conviction a denial of due process.'" *United States v. Shareef*, 190 F.3d 71,

78 (2d Cir.1999) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *accord, e.g.*, *Elias*,

285 F.2d at 190. In determining whether the alleged misconduct amounted to "prejudicial error,"

courts must review the conduct in the context of the entire trial. *See Strouse v. Leonardo*, 928

F.2d 548, 557 (2d Cir.1991); *United States v. Modica*, 663 F.2d at 1181 ("The first question is

whether the improper comments were minor aberrations in a prolonged trial or cumulative evidence of a proceeding dominated by passion and prejudice.") (internal quotation marks omitted)). In addition to assessing the "severity of the misconduct," the court also must examine "the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *Elias*, 285 F.3d at 191.

Although the prosecutor did not say "murder", which has a different meaning under the law than the word he did use ("killing"), the remark nevertheless was clearly and obviously an egregiously improper remark, the likes of which might be expected from a middle school moot-court participant. However, the Second Circuit has "repeatedly stated that the severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding." *Id.* (citing *Melendez*, 57 F.3d at 241). This was the only remark challenged by petitioner on direct appeal. Furthermore, the trial court took steps to cure the misconduct: it sustained defense counsel's objection and immediately directed the jury to disregard the prosecutor's statement. The trial court later gave a strongly worded and specific curative instruction, drafted by defense counsel, to the jury during its general charge. Third, and most important, Bennett cannot show that "absent the isolated impropriety of the prosecutor in rebuttal summation (taken in the context of the entire trial), [he] would not have been convicted." *Elias*, 285 F.3d at 192.

Stated another away, Bennett has failed to show "substantial prejudice" as a result of the improper comment. Although the jury convicted Bennett of felony murder based on the underlying robbery, it acquitted him of the count charging him with intentional murder under an accomplice theory of liability. To acquit him of intentional murder under an accomplice theory, the jury necessarily rejected any argument that Bennett intended that Lindeman be killed, or

participated in the actual murder. The jury's actual verdict greatly undermines Bennett's contention that the remarks had a detrimental effect on the jury's deliberations.

In order to convict him of felony murder, however, the jury did not need to find that Bennett directly assisted Cordero in killing Lindeman. Rather, all that was necessary was that the jury find Bennett guilty of robbing Lindeman and reject his statutory affirmative defense to felony murder under Penal Law § 125.25(3). he evidence presented by the prosecution strongly supported the jury's verdict of guilty with regard to the robbery and felony murder. As an initial matter, there was really no dispute that petitioner actually stole a substantial amount of money and property from Lindeman; he illegally obtained thousands of dollars from the victim in the form of stolen personal property, the contents of the victim's bank accounts, and financial assets. There were photographs of Bennett disguising himself as the victim at banks, cashing the victim's checks. Bennett admitted that he knew that the victim's sister, who purportedly was to receive some of the stolen money, was not legally entitled to those funds. There also was testimony from Banks, who had been incarcerated with Bennett, that Bennett told him that he (Bennett) was holding Lindeman down while Cordero strangled him. R.588. In Bennett's grand jury testimony, which was read into the record, he admitted going with Cordero to Lindeman's apartment for the express purpose of assisting Cordero in illicitly wringing more money out of Lindeman–by force if necessary. R.837. Bennett stated in his July 22, 1999 statement that "Jerry was planning on going into the house and getting checks from Ralph Lindeman and possibly tying him up." R.18. Bennett also admitted that he knew that "it wasn't a legal method" he and Cordero going to use to get the money from Lindeman. R.839. The robbery charge, which formed the basis for the felony murder conviction, was overwhelmingly supported by the

evidence.

For the foregoing reasons, Bennett's claim of prosecutorial misconduct is denied.

**B.    Denial of the Motion to Suppress Petitioner's May 8, 1997 Statement (Petitioner's Point II)**

Following a hearing, the trial court denied Bennett's motion to suppress his statements to

the police in an oral ruling:

> [W]ith regard to the May 8th, '97 statement, I find there is no indicia present of custody. And there's nothing involved in that setting in which the statement was given or the telephone call made to his parents' home or the exchange in the parking lot that would lead a reasonable person to believe that he was in custody at any time during that whole encounter. He was not subjected to any force. He was apparently given the impression that he was free to leave. He voluntarily accompanied the detective from the parking lot to the State Police barracks. At that point, he was not given any reason to believe that he was in custody during the actual taking of the statement. He also arrived at the scene at a time, the parking lot at the time he arranged and, clearly, he went there voluntarily. Accordingly, I find that there is no basis on which to suppress that statement. And, I also find as a, as dicta, I guess, is that the Defendant was in fact read his rights or he read his rights. He was given his rights in an effective way in any event, so even if I were to find that he was in custody, I would still deny the suppression motion on that basis.
> With regard to the July 22nd, '99 statement, clearly, that was something he volunteered to do. It would appear that he arranged the statement, that he was accompanied by his attorney, that he was read his rights. There certainly is no basis to suppress that statement. The mere fact that his attorney said his parents had some kind of, you know, criminal liability in this case certainly isn't enough to render this statement involuntary. And in fact, Mr. Church [petitioner's pre-trial attorney], at least on his direct testimony, his testimony was of marginal relevance even because he merely said that the police indicated to him that there was some possibility that his parents could be charged and that he relayed that to the Defendant. That, but there was certainly, it certainly wasn't made clear to me at least that he would somehow exonerate his parents by giving this statement. And I can't draw that conclusion from the proof that I have.
> I find specifically that the Defendant was not in custody. That he, no reasonable person in his position would believe that he was in custody during the giving of that statement or the arranging of the statement. And in fact, that there was not a single indicia [sic] of custody present in that situation. In any event, if I were to find that he was in custody, I would still not suppress that statement either because I find that he was given an effective, meaningful reading of his

Constitutional rights and effectively waived them on advice of counsel.

R.168-70. On direct appeal, the Appellate Division affirmed the trial court's ruling:

> The evidence at the suppression hearing establishes that defendant voluntarily met
> with investigators and accompanied them to the police station, and that defendant
> had no reason to believe that he was not free to leave until after the questioning
> was completed. We therefore agree with the suppression court that defendant was
> not in custody when questioned and that *Miranda* warnings were not required. In
> any event, any error in refusing to suppress defendant's initial statement is
> harmless beyond a reasonable doubt. Subsequent statements by defendant, which
> also were admitted at trial, were more incriminating than his initial statement.

*People v. Bennett*, 298 A.D.2d at 965, 748 N.Y.S.2d at 117 (citations omitted).

The voluntariness of a confession is a question of law. *Miller v. Fenton*, 474 U.S. 104,

112 (1985). Although a state court's factual findings are entitled to a presumption of correctness,

28 U.S.C. 2254(e)(1), the ultimate determination of whether a defendant is "in custody" is a

mixed question of law and fact qualifying for independent review on federal habeas. *Thompson

v. Keohane*, 516 U.S. at 112-13. The Supreme Court explained in *Thompson v. Keohane* that

"[t]wo discrete inquiries are essential" to the custody determination. First, the court must ask

"what were the circumstances surrounding the interrogation; and second given those

circumstances, would a reasonable person have felt he or she was not at liberty to terminate the

interrogation and leave." The first inquiry is "distinctly factual," *Thompson v. Keohane*, 516 U.S.

99, 112 (1995), and so the "[s]tate court's factual findings on these scene- and action-setting

questions attract a presumption of correctness[,]" *id.* The second inquiry, however, requires the

court to apply the controlling legal standard to the historical facts. *See id.*

The Supreme Court has stated, "Our decisions make clear that the initial determination of

custody depends on the objective circumstances of the interrogation, not on the subjective views

harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). The court must employ an objective standard, *Stansbury*, 511 U.S. at 322-24, and must find that a reasonable person in the defendant's position would have understood himself to be subjected to restraints on his freedom comparable to those associated with a formal arrest, in order to find that a defendant was in custody. *Berkemer v. McCarty,* 468 U.S. 420, 441 (1984). The court must examine the totality of the circumstances, *United States v. Ruggles*, 70 F.3d 262, 264-65 (2d Cir. 1995), and may consider the person's background, experience, familiarity with police questioning and *Miranda* rights, age, maturity, education, and intelligence, *id.* "An accused is in 'custody' when, in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *Campaneria v. Reid*, 891 F.2d 1014, 1021 n. 1 (2d Cir.1989), *cert. denied*, 499 U.S. 949 (1991).

Here, the investigators contacted Bennett at his parents' home and asked him to speak with them. He agreed, and he and the police arranged a mutually convenient time and place to meet. The fact that the investigators considered him to be a suspect in the Lindeman matter, however, is not dispositive. "[U]nder *Miranda* '[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time'; rather, 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'" *Stansbury*, 511 U.S. at 324 (quoting *Berkemer*, 468 U.S. at 442); *see also Beckwith v. United States*, 425 U.S. 341, 347(1976) (being the focus of a criminal investigation is not sufficient to render one in Miranda custody); *accord United States v. Zahrey*, 963 F. Supp.2d 1273, 1287 (E.D.N.Y. 1997) ("[A] police officer's subjective belief or view about whether the

subject of an interview is a suspect in a criminal investigation, is inconsequential in the custody

analysis. As a result, the fact that Lieutenant Boyce already suspected, based on information

from the informant Quick, that [defendant] Mercado had been involved in the armored car

robbery does not render the interview custodial.") (internal citations to record omitted).

Bennett voluntarily agreed to speak with the investigators and to go with them to the

police barracks in order to their conversation about the photographs. Bennett argued on appeal

that it was "evident" that he "was restricted in his freedom[,] having been taken miles away from

where his vehicle was located." Resp't Ex. F at A:31. Bennett states that the "questioning was

done at a State Police barracks behind locked doors by trained investigators." In *Oregon v.*

*Mathiason*, 429 U.S. 492 (1977), the Supreme Court made it clear that *Miranda* warnings are not

required simply because "the questioning took place in a 'coercive environment.'" *Id.* at 495.

Thus, an officer is not required to administer *Miranda* warnings to every person they question,

even if that questioning takes place at the police station. *Stansbury*, 511 U.S. at 325 ("Even a

clear statement from an officer that the person  under interrogation is a prime suspect is not, in

itself, dispositive of the custody issue[.]"). *Mathiason*, 429 U.S. at 493 (custody not established

when officer asks defendant to meet at defendant's convenience, and "the officer met defendant

in the hallway, shook hands and took him into an office . . . did not place defendant under arrest .

. . told defendant he wanted to talk to him about a burglary and that his truthfulness would

possibly be considered by the district attorney or judge")

Factors indicating that a defendant was not free to leave include "the display of a

weapon, physical touching of the person by the officer and language or tone indicating a show of

authority that may compel compliance with the officer's request." *United States v. Sugrim*, 732

-33-

F.2d 25, 28 (2d Cir.1984) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Here, Bennett was neither handcuffed nor otherwise restrained at any time during the transportation to the barracks or during the interview itself. The investigators did not display a weapon at any time. Bennett was not restrained at the police barracks, where he waited in an interview room with the door open. Bennett never asked to leave and was never told by the police that he was not free to go if he wanted.

Bennett also argued that the custodial nature of the interrogation was evidence because the investigators' "attitude towards . . . [him] was accusatory in nature in that [they] showed him photographs and asked how it could not be him in the photographs when he initially denied his participating in the negotiation of the checks being questioned about." "[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Oregon v. Mathiason*, 429 U.S. at 495 (observing that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime"). In *Mathiason*, 429 U.S. at 495, the Supreme Court found that the defendant was not in *Miranda* custody even though police presented him with false evidence of his guilt during questioning at the police station.

Considering the facts and circumstances of Bennett's May 8, 1997 encounter with the police against the relevant federal precedent concerning *Miranda*, the Court cannot say that the trial court or the Appellate Division unreasonably applied the law in determining that Bennett

was not "in custody". However, even if the admission of Bennett's May 8, 1997 statement was made in error, I agree with the Appellate Division that "any error occasioned by the introduction of the initial statement was "harmless beyond a reasonable doubt" because the subsequent two statement were "more incriminating . . . ." *People v. Bennett*, 298 A.D.2d at 965.

*Miranda* violations are subject to harmless error analysis. *Rollins v. Leonardo*, 938 F.2d 380, 382 (2d Cir.1991) (*per curiam*) (approving district court's application of harmless error analysis to *Miranda* violation), *cert. denied*, 502 U.S. 1062 (1992); *see also Arizona v. Fulminante*, 499 U.S. 279, 306-12 (1991) (applying harmless error analysis even to coerced confession). In each subsequent statement that Bennett gave to the authorities, he inculpated himself further and further into Lindeman's death. A review of the case law reveals that in circumstances similar to those presented here, federal courts have consistently found the erroneous admission of a defendant's un-*Mirandized* confession to be harmless error. *E.g.*, *Vasquez v. Senkowski*, 54 F. Supp.2d 208, 214 (S.D.N.Y.1999) (find that admission of petitioner's first confession harmless  where petitioner gave several more confessions following *Miranda* warnings and "[w]ith each confession, petitioner revealed new information to the detectives, culminating in a full, videotaped confession . . . ."); *Parsad v. Greiner*, 337 F.3d 175, 185-86 (2d Cir. 2003) (holding that it was harmless error to admit petitioner's pre-*Miranda*, custodial statements where his post-*Miranda*  statements were properly admitted and cumulative of pre-*Miranda* statements); *Tankleff v. Senkowski*, 135 F.3d 235, 245-46 (2d Cir.1998) (State court's error in admitting petitioner's "inculpatory pre-*Miranda*  statements . . . was harmless beyond a reasonable doubt"  where the statements were "brief and substantially the same as some of his later, admissible confession."); *Nova v. Bartlett*, 211 F.3d 705, 709 (2d Cir. 2000)

("in light of the fact that [petitioner] made complete, detailed [oral, written, and videotaped] confessions after having been read his [*Miranda*] rights, the admission of his pre-warning statements [agreeing to tell the truth], even if inappropriate, would amount to no more than harmless error." ); *Vega v. Artuz*, 97 Civ. 3775, 2002 WL 252764, at *11 (S.D.N.Y. Feb. 20, 2002) (Even if petitioner was in custody before receiving *Miranda* warnings, any error in admitting pre-*Miranda* statements harmless where pre-*Miranda* statement that he was going to tell the truth was not inculpatory and post-*Miranda* oral and videotaped statements were admissible.); *Wilson v. Walker*, No. 00-CV-5348, 2001 WL 1388299, at *3-4 (E.D .N .Y. Nov. 2, 2001) (where petitioner's "full and detailed" "subsequent post-warning confessions were properly admitted, any possible error in the admission of the pre-warning confession was harmless." ).

### C.       Erroneous Introduction of Testimony  (Petitioner's Point III)

Bennett contends that the trial court erroneously admitted the testimony of Beu, Wasnock, and Banks. Beu and Wasnock testified regarding Bennett's efforts to recruit them to give false testimony incriminating Bennett's cohort, Cordero, which would have indirectly benefitted Bennett's case. Banks gave similar testimony about Bennett's attempt to have him give false testimony, and additionally testified that Bennett had admitted to directly participating in Lindeman's murder. R.588. Banks testified at trial as follows: "He said he was, he said while he was wrestling, he was wrestling and holding Lindeman down while Jerry [Cordero] choked him." R.588.

On direct appeal, the Appellate Division rejected these contentions on the merits:

The [trial] court properly admitted evidence of defendant's subornation of perjury. Evidence that a defendant attempted to procure false testimony or to

corrupt a witness is generally admissible as evidence of consciousness of guilt. Moreover, the probative value of the evidence outweighed its potential for prejudice to defendant.

*People v. Bennett*, 298 A.D.2d at 965-66 (citations and internal quotations omitted).

Federal habeas relief generally does not lie for mere errors of state evidentiary law. *E.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also* 28 U.S.C. § 2254(a). Rather, to warrant habeas relief, an error of state law have deprived petitioner of a fundamentally fair trial. *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1965)).

As a matter of New York state law, such evidence is highly probative of a defendant's consciousness of guilt and has been routinely admitted. *See People v. Hernandez*, 118 A.D.2d 729, 500 N.Y.S.2d 61 (App. Div. 2d Dept. 1986) (holding that admission of evidence of defendant's attempt to procure false testimony from complainant, which evidence was indicative of defendant's consciousness of guilt and was supported "by other proof of truly substantial character," and was thus not prejudicial, was not reversible error) (quoting *People v. Leyra*, 1 N.Y.2d 199, 208-09, 151 N.Y.S.2d 658 and citing *People v. Shaw*, 111 A.D.2d 415, 489 N.Y.S.2d 378)); *People v. Monk*, 50 A.D.2d 925, 853 N.Y.S.2d 784 (App. Div. 2d Dept. 2008) (holding that evidence of defendant's false alibi was admissible; *People v. DeVivo*, 282 A.D.2d 770, 726 N.Y.S.2d 145 (App. Div. 3d Dept. 2001) (Testimony of various witnesses that defendant had threatened them, implored them to testify falsely and/or offered them money to change their testimony did not deny defendant a fair trial in prosecution for burglary, criminal mischief, and perjury; evidence of such conduct was indicative of defendant's consciousness of guilt).

Furthermore, as a matter of federal law,  "[e]vidence such as attempted witness or jury tampering is admissible as probative of a defendant's consciousness of guilt." *Untied States v. Perez*, No. 01 CR. 848(SWK), 2003 WL 721568, at *5 (S.D.N.Y. Feb. 28, 2003) (citing *United States v. Macklin*, 926 F.2d 1323, 1329 (2d Cir.1991) (Such evidence may be admitted after the court determines that: (1) the evidence is offered for a "purpose other than to prove the defendant's bad character or criminal propensity;" (2) the evidence is relevant under Federal Rules of Evidence 401 and 402; and (3) provides an appropriate limiting instruction to the jury, if one is requested.) (quoting *United States v. Colon*, 880 F.2d 650, 656 (2d Cir.1989)); *see also United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir.1988); *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *Mealer v. Jones*, 573 F. Supp. 675, 678 (S.D.N.Y. 1983) (holding that statements made by murder suspect, after indictment but prior to trial, to crime witness, encouraging witness to testify falsely as to circumstances surrounding crime, constituted separate criminal conduct of suborning perjury and were admissible at murder trial to prove consciousness of guilt, though made in absence of counsel and to witness who was then acting as government agent); *United States v. Gallego*, 913 F. Supp. 209, 217 (S.D.N.Y. 1996) (holding, *in limine*, that evidence from alleged coconspirator, who was also cooperating witness, that defendant and coconspirator arranged for another to give false testimony for purpose of providing an innocent explanation to certain damage to witness's car that allegedly was sustained during crime, was admissible in defendants' trial for conspiracy to murder and murder, as government offered evidence to establish defendant's consciousness of guilt).

In *United States v. Perez*, for example, the defendant argued that the trial court erroneously allowed evidence of a witness bribery scheme to be presented at trial. The witness in

question testified that she met with the defendant four times prior to trial and, each time they met, he asked her to give a false statement regarding the events for which he was being tried to an investigator hired by his defense counsel. The district court stated that defendant Perez "put a plan into motion whereby [the witness's] false statements could have led to the wrongful suppression of that evidence and affected the outcome of this case." 2003 WL 721568, at *5. As in *Perez*, Bennett's "actions were designed to influence the course of the criminal charges pending against him," *id.*, and were "exactly the type which evince consciousness of guilt on the part of the defendant . . . .," *id.*

Here, the evidence of Bennett's subornation of perjury was properly admitted, as a matter of both state and federal evidentiary law. As there was no error of mere evidentiary law, I cannot find that an error of federal constitutional magnitude occurred. Accordingly, this claim is dismissed.


### D. Improper Introduction of the Prosecutor's Grand Jury Testimony (Petitioner's Point IV)

Bennett argues, as he did on direct appeal, that his grand jury testimony was involuntary because the prosecution withdrew their plea offer after it was revealed that Bennett wrongfully had solicited false testimony from several witnesses at the grand jury. As an initial matter, I note that this claim asserts a violation of New York state evidentiary law. As respondent argues, mere claims of state-law error are generally not cognizable in federal habeas review. *See* 28 U.S.C. § 2254(a). Bennett principally relies upon the New York Court of Appeals case, *People v. Spitaleri*, 9 N.Y.2d 168 (N.Y. 1961), for the proposition that "'once a guilty plea has been withdrawn, it is "out of the case forever."'" Resp't Ex. J. Bennett also cites the Supreme Court

decision in *Kercheval v. United States*, 274 U.S. 220 (1927), for the same proposition.

However, the evidentiary issue presented by Bennett's case was squarely presented and rejected in *People v. Curdgel*, 83 N.Y.2d at 864-65, a case interpreting the proper scope of *Spitaleri*, and the authority on which the Appellate Division relied in holding that the trial court properly admitted petitioner's grand jury testimony.  In *Curdgel*, the police were investigating an arson. Following his arrest for unrelated crimes, defendant Curdgel told the prosecutor that he had been involved in setting the fire and was willing to cooperate in its investigation. His counsel arranged for him to provide the authorities with written and oral accounts of the crime, and counsel was also present when defendant signed a waiver of immunity from prosecution. In exchange for a sentence promise of 1½ to 3 years' imprisonment, defendant agreed to testify before a grand jury about the crime and "cooperate fully" in the prosecution of his accomplices. Soon after describing to the grand jury how his accomplices had set fire to the house in retaliation for a drug-related debt, defendant Curdgel declared, in a televised news broadcast, that he had lied to the grand jury, and apologized to his accomplices. Concluding that defendant's public recantation had "effectively eliminat[ed] his utility and credibility as a prosecution witness," the prosecution refused to honor the plea agreement. Defendant Curdgel was ultimately convicted of four counts of murder in the second degree and related counts, following a trial at which his grand jury testimony was introduced against him.

As was the case in *Curdgel*, petitioner's grand jury testimony was induced by the plea agreement; and in making the plea offer, the prosecution had bargained for the use of defendant's testimony in prosecuting his accomplice. Once the prosecution voided the agreement, they were permitted to "use the testimony he had already given in any manner they

saw fit, as this was a counseled, foreseeable use of his testimony, and a benefit that should not be 'retroactively vitiated,'" *People v. Curdgel*, 83 N.Y.2d at 865 (quoting *Evans*, 58 N.Y.2d at 24).

Furthermore, like the defendant in *Curdgel,* Bennett also had "unclean hands." The Court of Appeals held that Curdgel's "own conduct, after he had voluntarily incriminated himself, caused him to lose his benefit of the bargain." *Id.* The Court of Appeals reasoned that although the prosecution was "not entitled to gain more pursuant to the agreement, they were permitted to keep what they already had," *id.*–namely, the defendant's grand jury testimony. The facts of *Curdgel* are nearly identical to those presented by Bennett's case, and Bennett's grand jury testimony therefore was properly admissible at his trial.

As the foregoing discussion makes clear, there was no error of state evidentiary law; the trial court's ruling allowing the prosecutor to admit Bennett's grand jury testimony was well-supported by *People v. Curdgel*. Moreover, even if there had been an error of evidentiary law under *Spitaleri*, there was no error of federal constitutional magnitude. Indeed, the New York Court of Appeals has consistently stated that *Spitaleri*, which is based "entirely on fairness grounds," *People v Evans*, 58 N.Y.2d at 22, "does not prevent use of defendant's statements against him." *People v. Curdgel*, 83 N.Y.2d at 865; *see also People v. Evans*, 58 N.Y.2d at 24 (specifically declining to extend the *Spitaleri* doctrine to preclude use of statements induced by a plea promise).

For the foregoing reasons, the claim that petitioner's grand jury testimony was erroneously admitted against him at trial does not merit habeas relief and is denied.

### E.    Claims Raised in Petitioner's *Coram Nobis* Application

As respondent points out, in support of his petition for habeas relief, Bennett has raised

the issues on which he based his *coram nobis* application, here relying upon the arguments set

forth in his affidavit submitted in support of that application. *See* Resp't Ex. E. Respondent

points out that Bennett also filed a memorandum of law in support of that application, *see* Resp't

Ex. G, but its primary purpose appears to have been to re-argue the merits of his direct appeal

and to criticize trial counsel's performance, rather than to address the "effectiveness of appellate

counsel" issue. As noted above, trial counsel represented Bennett in connection with his direct

appeal.

The two-pronged test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), for

evaluating claims of ineffective assistance of trial counsel also applies in the appellate counsel

context. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *Claudio v. Scully*, 982 F.2d 798,

803 (2d Cir. 1992). To succeed on claim that appellate counsel provided constitutionally

ineffective representation, a petitioner must demonstrate both that counsel's performance fell

below an objective standard of reasonableness and that there is a "reasonable probability" that,

but for counsel's error, the outcome of petitioner's criminal proceeding would have been

different. *Strickland v. Washington*, 466 U.S. at 688-94. Where a petitioner claims that appellate

counsel's performance was deficient based on a failure to raise a claim, a petitioner must

demonstrate more than the omission by appellate counsel of a non-frivolous argument. Rather,

he must show a reasonable probability exists that the outcome of the appellate process would

have been favorable. *Mayo v. Henderson*, 13 F.3d at 533. The Second Circuit has instructed that

the "district court must examine the trial record to determine whether appellate counsel failed to

present significant and obvious issues on appeal." *Id.* (quotation omitted). In general, it is "only

when ignored issues are clearly stronger than those presented" that "the presumption of effective

assistance . . . [will] be overcome." *Id.* (quotation omitted); *accord Clark v. Stinson*, 214 F.3d

315, 318 (2d Cir. 2000). It bears noting that an appellate attorney "need not advance every

argument, regardless of merit, urged by the appellant." *Jameson v. Coughlin*, 22 F.3d 427, 429

(2d Cir. 1994) (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985)). To the contrary, "winnowing

out" weaker claims in favor of concentrating on relatively stronger arguments "is the hallmark of

effective advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (citing *Jones v. Barnes*, 463

U.S. 745, 751-52 (1983)).

In his *coram nobis* affidavit, Bennett faults counsel for failing to communicate

adequately with him; having to obtain an extension of time to perfect the appeal; failing to file a

reply brief; and failing to timely advise him that the Court of Appeals had denied leave to appeal.

*See* Resp't Ex. E, ¶¶20-25. He also criticizes the appellate brief because it had grammatical and

spelling errors, failed to object to the prosecutor's first reference to the withdrawn plea

agreement during summation, contained incorrect case citations and dates of events, contained

"plagiarism" based on direct quotations from  reported decisions without proper attributions to

the source, and citing inapposite case law. *See* Resp't Ex. E, ¶¶34-52. Respondent argues that

most of the complained-of errors "are trivial at best, and none satisfies the first prong of the

*Strickland* test." Resp't Mem. at 33. Although the Court  generally agrees with respondent, the

Court nevertheless is very troubled by appellate counsel's substandard performance in failing to

timely perfect the appeal and failure to timely notify his client about significant events, such as

the Court of Appeals' denial of leave to appeal. It is fortunate for counsel that Bennett was not

prejudiced by these derelictions. Counsel was able to obtain an extension of time to file his

appellate brief. Moreover, the delay Bennett experienced in discovering that his appeal had

failed ultimately did not compromise the timeliness of his habeas petition.  In the absence of discernible prejudice, Bennett cannot succeed on his claim of ineffectiveness.

The Court next turns to Bennett's claim that appellate counsel "cite[d] a completely inappropriate line of cases" and failed to cite to "the fundamental, landmark case of *People v. Spitaleri*, 9 N.Y.2d 168 . . . and its progeny." Resp't Ex. E, ¶38. I agree with respondent that appellate counsel raised the correct legal theory and that the principles for which *Spitaleri* stands were not germane to any contested issue on Bennett's appeal. *See* Resp't Mem. at 34.

In *Spitaleri*, the trial court had permitted, over defense objection, the introduction of defendant's previous guilty plea. The judge also had referred to that plea in his instructions to the jury and had allowed the prosecutor to call as a witness defendant's prior attorney to testify regarding the plea and to defendant's admissions to him. The New York Court of Appeals defined the issue as "whether it is lawful in New York for a court, after allowing a guilty plea to be set at naught, to allow the jury to use that same plea as proof of guilt." 9 N.Y.2d at 172. The court concluded that "[s]uch a distortion of purpose should not be allowed." *Id.*

At Bennett's trial, the issue was not whether the court should have allowed the jury to consider, as evidence of guilt, the fact that petitioner had agreed to plead guilty to an unidentified class B violent felony;[10] the court did not do so. Rather, the trial court sustained defense counsel's objection to the prosecutor's reference  it in his summation, that Bennett had admitted that he was "personally involved in killing Ralph Lindeman," R.1017, and had "agreed to plead guilty to it and that's in the record," *id.* The trial court immediately instructed the jury to disregard that statement and later issued a strong curative instruction drafted by defense counsel.

---

[10]     This was referenced in the portion of Bennett's grand jury testimony that was read into the record. However, the grand jury transcript does not identify the felony to Bennett had agreed to plead guilty.

*Spitaleri* is not entirely apposite here because the real issue in Bennett's case was whether the prosecutor's remark was misconduct so egregious as to deprived Bennett of his due process right to a fair trial. This was what appellate counsel argued on appeal–in addition to his other arguments that the trial court improperly allowed admission of Bennett's statement to the police to be admitted, his grand jury testimony, and the evidence that he suborned perjury. Moreover, as respondent notes, *Spitaleri*'s facts were so appalling that counsel might reasonably have decided that citing it would make the error claimed by Bennett to seem pale by comparison. *See* Resp't Mem. at 35 (Docket No. 21).

As respondent points out, the line of cases which Bennett now claims were "inappropriate" were, in fact, directly relevant to appellate counsel's argument that improper argument on summation mandated a new trial. *See*, *e.g.*, *People v. Payne*, 187 A.D.2d 845 (App. Div. 4th Dept. 1993) (reversing conviction based in large part on improper comments made by the prosecutor during summation); *People v. Mott*, 94 A.D.2d 415 (App. Div. 4th Dept. 1983) (same) (cited in Petitioner's Appellate Brief).

Bennett has not identified, nor can he identify, a stronger argument that appellate counsel could have raised that would have, with any reasonable probability, resulted in the reversal of his conviction. The arguments that appellate counsel chose to argue were the most crucial to Bennett's case. I note that the Appellate Division did not summarily reject any of appellate counsel's issues but rather wrote a fairly lengthy decision considering the merits of each claim. What Bennett essentially is saying is that *he* would have made the same arguments–but more convincingly that appellate counsel did. The Court is not persuaded. Even if true, such an assertion does not establish that appellate counsel's performance was unreasonable in light of

prevailing professional norms. Most important, Bennett has failed to show that any of the claimed errors affected the Appellate Division's disposition of his direct appeal. For these reasons, his claim of ineffective assistance of appellate counsel does not warrant habeas relief.

## IV.      CONCLUSION

For all of the reasons discussed above, the Court denies petitioner James Timothy Bennett's petition for a writ of habeas corpus. Because Bennett has failed to make a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:       August 5, 2008
             Buffalo, New York